# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **NEAL P. GOULAS** | |
| **VS.** | **CIVIL ACTION NO. 2:12-cv-00898** |
| **LAGRECA INC,** | **JUDGE: FALLON "L"** |
| **LAGRECA SERVICES, INC.,** | |
| **D/B/A LAGRECA TRANSPORTATION,** | **MAGISTRATE: WILKINSON (2)** |
| **AND** | |
| **CHARLES P. LAGRECA, JR.** | |
| **INDIVIDUALLY AND ON BEHALF OF** | |
| **SAID ENTITIES AS OWNER** | |

## MEMORANDUM IN OPPOSITION TO LAGRECA'S MOTION FOR SUMMARY JUDGMENT

NOW INTO COURT, through undersigned counsel, comes Neal P. Goulas, II and files his memorandum in opposition to the motion for summary judgment filed by LaGreca Services, Inc. (hereinafter referred to as "LaGreca").

LaGreca has filed a motion for summary judgment asking for Goulas's overtime claims and whistleblower claims to be dismissed. LaGreca also claims that Charles P. LaGreca, Jr., individually, should be dismissed from the lawsuit as he is not a proper party to the suit. Goulas opposes this motion for summary judgment as it pertains to overtime claims because he was a manual laborer, who was not paid a bona fide salary and had no ability or input with regards to the hiring or firing of employees. In fact, Neal P. Goulas filed this very lawsuit because his employer, Charles P. LaGreca, Jr., fired him for objecting to the hiring and continued employment of a man who has subsequently admitted to using cocaine during the course and

scope of his employment. Goulas further opposes this motion for summary judgment as it pertains to dismissing his whistleblower claims because Goulas continually disclosed a violation of state law to LaGreca concerning Lyon's drug use and LaGreca admits in his own pleadings he terminated Goulas for same. Lastly, Goulas opposes LaGreca's motion for summary judgment as it pertains to Charles P. LaGreca, Jr., individually, being an improper party to the suit. Both LaGreca Services, Inc. and Charles P. LaGreca, Jr., individually, are "employers" pursuant to 29 U.S.C. § 203(d).

Goulas would like to further state to the Court that his reference to the Goulas Transcript is to specific portions of the transcript and that a complete copy of the transcript has not been attached. Goulas has not yet received a copy of his deposition transcript. When Goulas attempted to refer to copies of the Goulas Transcript that LaGreca attached, he found that it had been spliced with pages of the transcript intentionally removed. LaGreca further removed portions of the LaGreca Transcript that Goulas has original copies of. It is extremely disingenuous and improper to attach what "appears" to be entire copies of a deposition transcript and sneak portions of it out that shed an unfavorable light on your client. Just to be clear, Goulas has had no part in these shenanigans and has only referred to an incomplete copy of his transcript because he has yet to receive the official copy from the court reporter. For the reasons stated more fully herein, LaGreca's motion for summary judgment should be DENIED.

## I. LAW AND ARGUMENT

### A. *Summary Judgment Standard*

Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56; Celotex *Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). A

court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, "that the evidence favoring the non-moving party in insufficient to enable a reasonable jury to return a verdict in her favor." *Lavespere v. Niagra Mach. & Tool Works, Inc.,* 910 F. 2d 167, 178 (5th Cir. 1990)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). The moving party bears the burden of establishing that there are no genuine issues of material fact. However, the non-movant cannot rely merely on the pleadings, but must identify specific facts that establish a genuine issue exists for trial. *Little v. Liquid Air Corp.,* 37 F. 3d 1069, 1075 (5th Cir. 1994).

### *B. Goulas Was Not Exempt From the Overtime Provisions of the Act*

Goulas was Not Employed with LaGreca in a Bona Fide Executive Capacity; Thus Cannot Be Exempt from the Overtime Provisions of the Act.

> 29 C.F.R. § 541.100, General rule for executive employees:
>
> **(a)** The term "employee employed in a bona fide executive capacity" in section 13(a)(1) of the Act shall mean any employee:
> **(1)** Compensated on a salary basis at a rate of not less than $455 per week (or $380 per week, if employed in American Samoa by employers other than the Federal Government), exclusive of board, lodging or other facilities;
> **(2)** Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
> **(3)** Who customarily and regularly directs the work of two or more other employees; and
> **(4)** Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

*Goulas Was Not a Bona Fide Salaried Employee*

Goulas was not paid a salary. (Prevost Tr. 11:11-14). LaGreca created its own noncompliant hybrid system of compensation that it referred to as "guaranteed pay".

29 C.F.R. § 541.602, Salary

> (a) General rule. An employee will be considered to be paid on a "salary basis" within the meaning of these regulations if the employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed. Subject to the exceptions provided in paragraph (b) of this section, an exempt employee must receive the full salary for any week in which the employee performs any work without regard to the number of days or hours worked. Exempt employees need not be paid for any workweek in which they perform no work. An employee is not paid on a salary basis if deductions from the employee's predetermined compensation are made for absences occasioned by the employer or by the operating requirements of the business. If the employee is ready, willing and able to work, deductions may not be made for time when work is not available.

According to Carol Prevost, LaGreca's bookkeeper, guaranteed pay refers to a system of pay which requires LaGreca employees to work a certain number of hours in order to receive their paychecks; thus, their pay was subject to their performance of a certain quantity of work. (Prevost Tr. 11:15-20). The compensation itself, however, is not based upon an hourly amount. The compensation is determined by an annual amount guaranteed to the employee as long as the employee works a certain number of hours. (Prevost Tr. 11:21-24). Goulas was also subject to partial day pay docks which destroys the salary status of an employee. The LaGreca Services Handbook's Guidelines for Employment advertise its practice of partial day pay docks for ANY employee who is caught sleeping on the job or ANY employee who is more than ten minutes late but less than an hour late. (Ex. A-12 LaGreca Services Employee Handbook, p. 7-8). Goulas's

pay was actually docked $100.00 on 08/10/2009 for a half-day sick day. (See Employee Quick Report, attached as Ex. A-11, Ex. A-13, and A-14).

Employees could not be considered "salaried," under strict regulatory definition, for purposes of "bona fide executive" exemption to overtime requirements of the Fair Labor Standards Act (FLSA), where employer subjected employees to pay deductions on basis of part-day absences. Fair Labor Standards Act of 1938, §§ 7(a)(1), 13(a)(1), 29 U.S.C.A. §§ 207(a)(1), 213(a)(1). *Martin v. Malcolm Pirnie, Inc.*, 949 F.2d 611 (2d Cir. 1991). Managers and senior assistant managers were not exempt executive employees under overtime compensation provisions of FLSA where employer's disciplinary policy created significant likelihood of pay deductions due to disciplinary infractions and employer had actual practice of making such deductions from pay of managers; policy specifically stated that members of management were subject to pay deductions for disciplinary infractions and detailed procedures necessary to suspend employee without pay for disciplinary infractions. Fair Labor Standards Act of 1938, § 1 et seq., 29 U.S.C.A. § 201 et seq.; 29 C.F.R. §§ 541.1, 541.1(f), 541.118. *Takacs v. Hahn Auto. Corp.*, 246 F.3d 776 (6th Cir. 2001).

### *Goulas's Primary Duty Was That of a Manual Laborer*

Even if Goulas was paid pursuant to a bona fide salary plan, his duties were that of a blue collar manual laborer.

29 C.F.R. § 541.3, Scope of the section 13(a)(1) exemptions:

> **(a)** The section 13(a)(1) exemptions and the regulations in this part do not apply to manual laborers or other "blue collar" workers who

> perform work involving repetitive operations with their hands, physical skill and energy. Such nonexempt "blue collar" employees gain the skills and knowledge required for performance of their routine manual and physical work through apprenticeships and on-the-job training, not through the prolonged course of specialized intellectual instruction required for exempt learned professional employees such as medical doctors, architects and archeologists. Thus, for example, non-management production-line employees and non-management employees in maintenance, construction and similar occupations such as carpenters, electricians, mechanics, plumbers, iron workers, craftsmen, operating engineers, longshoremen, construction workers and laborers are entitled to minimum wage and overtime premium pay under the Fair Labor Standards Act, and are not exempt under the regulations in this part no matter how highly paid they might be.

LaGreca now claims Goulas' primary duty was that of management and supervision; thus Goulas was exempt from the overtime provisions of the act. LaGreca's deposition testimony tells a different story. LaGreca refers to Goulas as a "working superintendent". (LaGreca Tr. 18:6-25). LaGreca states Goulas "wasn't just a finger pointer", he did the work too. (LaGreca Tr.18-8-16). LaGreca goes on to describe Goulas' duties to include the fact that Goulas "always worked on a crew" (LaGreca Tr. 13:21-22). LaGreca describes instructing Goulas to run the locator which entailed holding a box and walking along job sites and radioing back to the operator with measurements to control the drill bit. (LaGreca Tr. 14:2-19). LaGreca then describes Goulas's duties as running equipment, operating, driving trucks (LaGreca Tr. 14:23-24) and washing equipment. (LaGreca Tr. 16:6). LaGreca states "It only takes one to two minutes to fill out the report I need." (LaGreca Tr. 19:13-14).

Working foreman, who supervised from 11 to 13 employees operating envelope machines, who made necessary adjustments and kept machines in operation, and who assisted in the actual work whenever and wherever he was needed, was an "employee" subject to the Fair Labor Standards Act, rather than an exempt "executive" or "administrative" employee. Fair Labor Standards Act of 1938, §§ 1 et seq., 13(a)(1), 29 U.S.C.A. §§ 201 et seq., 213(a)(1). *Walling v. Jacksonville Paper Co.*, 69 F. Supp. 599 (S.D. Fla. 1947) aff'd sub nom. *Jacksonville Paper Co. v. McComb,* 167 F.2d 448 (5th Cir. 1948) rev'd, 336 U.S. 187, 69 S. Ct. 497, 93 L. Ed. 599 (1949)

*Goulas Had No Authority to Hire or Fire Employees; nor Was His Opinion Given Any Weight*

Goulas filed suit against LaGreca for terminating his employment because he objected to the hiring and continued employment of a man who has admitted, via affidavit, to using cocaine on the job site. If Goulas had the authority to hire or fire employees, he would have refused to hire Lyons and/or terminated his employment. Further, if Goulas's opinion was given any weight at LaGreca Services, he would not have been terminated on the grounds of insubordination for voicing such an objection. (Ex. A-15). Lastly, if Goulas's opinion was given any consideration by LaGreca at all, the record would not reflect LaGreca making statements such as he did not allow Goulas to influence his hiring decisions as it was "none of his business" and LaGreca "wasn't going to allow Goulas to tell him what to do". LaGreca's deposition testimony states he told Goulas, "Don't tell me what to do with my company." The record further reflects LaGreca's bookkeeper states he (LaGreca) was solely responsible for

hiring and firing. (See LaGreca's Answer and Reconventional Demand Rec. Doc. 1¶3, LaGreca Tr. 22:22-24 and 27:9-14 and Prevost Tr. 23:12-17)

### C. Goulas's Claims Are Not Barred By the Three Year Statute of Limitations Because LaGreca Was Engaged in a Scheme to Defraud Workers Compensation of their Premiums and Goulas of His Overtime; thus, its Conduct Showed Reckless Disregard and Willfulness

The rule of law governing the FLSA's statute of limitations is 29 U.S.C. § 255(a) which states, in part, "and every such action shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued;" In order to trigger the three year statute of limitations, we must now show LaGreca's conduct was willful.

In light of the fact that LaGreca's own bookkeeper testified the payroll was manipulated to reduce workers compensation premiums (Prevost Tr. 23:3-11), its conduct should be regarded as willful. The United States Supreme Court has adopted a standard for defining "willful." Discussion of this standard can be seen in *Trans World Airlines, Inc. v. Thurston*, an ADEA case, which stays "a violation of the Act was "willful if the employer…knew or showed reckless disregard for the matter of whether its conduct was prohibited." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 105 S. Ct. 613, 83 L. Ed. 2d 523 (1985)

LaGreca was engaged in a scheme to commit workers compensation premium fraud. (Prevost Tr. 16:20-23:11). The hours reflected on LaGreca's paystubs were not a reflection of the actual hours worked. (Prevost Tr. 23:3-11). The scheme LaGreca employed to circumvent workers compensation premiums as well as the overtime provisions of the act is known as the

split-day plan. LaGreca underreported his payroll in the two years prior to devising this scheme. (Ex. A-16). Employers have been engaging in this scheme for decades and with such frequency that the Fair Labor Standards Act now recognizes such a compensation plan as an intentional act to evade compliance.

29 § 778.501, "Split-Day Plan"

> **(a)** Another device designed to evade the overtime requirements of the Act was a plan known as the "Poxon" or "split-day" plan. Under this plan the normal or regular workday is artificially divided into two portions one of which is arbitrarily labeled the "straight time" portion of the day and the other the "overtime" portion. Under such a plan, an employee who would ordinarily command an hourly rate of pay well in excess of the minimum for his work is assigned a low hourly rate (often the minimum) for the first hour (or the first 2 or 4 hours) of each day. This rate is designated as the regular rate: "time and one-half" based on such rate is paid for each additional hour worked during the workday. Thus, for example, an employee is arbitrarily assigned an hourly rate of $5 per hour under a contract which provides for the payment of so-called "overtime" for all hours in excess of 4 per day. Thus, for the normal or regular 8-hour day the employee would receive $20 for the first 4 hours and $30 for the remaining 4 hours; and a total of $50 for 8 hours. (This is exactly what he would receive at the straight time rate of $6.25 per hour.) On the sixth 8-hour day the employee likewise receives $50 and the employer claims to owe no additional overtime pay under the statute since he has already compensated the employee at "overtime" rates for 20 hours of the workweek.
> **(b)** Such a division of the normal 8-hour workday into 4 straight time hours and 4 overtime hours is purely fictitious. The employee is not paid at the rate of $5 an hour and the alleged overtime rate of $7.50 per hour is not paid for overtime work. It is not geared either to hours "in excess of the employee's normal working hours or regular working hours" ( section 7(e)(5) or for work "outside of the hours established in good faith * * * as the basic, normal, or regular workday" ( section 7(e) (7)) and it cannot therefore qualify as an overtime rate. The regular rate of pay of the employee in this situation is $6.25 per hour and he is owed additional overtime compensation, based on this rate, for all hours in excess of the applicable maximum hours standard. This rule was settled by the Supreme Court in the case of *Walling* v. *Helmerich & Payne,* 323 U.S. 37, and its validity has been reemphasized by the definition of the term "regular rate" in section 7(e) of the Act as amended.

In *Walling v. Helmerich*, the United States Supreme Court stated, "As we pointed out in *Overnight Motor Co. v. Missel*, 316 U.S. 572, 577, 578, 62 S.Ct. 1216, 1219, 1220, 86 L.Ed. 1682, the Congressional purpose in enacting Section 7(a) was twofold: (1) to spread employment by placing financial pressure on the employer through the overtime pay requirement, see also *Southland Gasoline Co. v. Bayley*, 319 U.S. 44, 48, 63 S.Ct. 917, 919, 87 L.Ed. 1244; and (2) to compensate employees for the burden of a workweek in excess of the hours fixed in the Act. Yet neither objective could be attained under the split-day plan. It enabled respondent to avoid paying real overtime wages for at least the first 40 hours worked in excess of the statutory maximum workweek, thus negativing any possible effect such a payment might have had upon the spreading of employment. And the plan was so designed as to deprive the employees of their statutory right to receive for all hours worked in excess of the first regular 40 hours one and one-half times the actual regular rate. The statutory maximum workweek of 40 hours was by contract twisted into an 80 hour maximum workweek. No plan so obviously inconsistent with the statutory purpose can lay a claim to legality." *Walling v. Helmerich & Payne*, 323 U.S. 37, 40, 65 S. Ct. 11, 13, 89 L. Ed. 29 (1944)

The Supreme Court goes on to say, "But respondent's plan made no effort to base the regular rate upon the wages actually received or upon the hours actually and regularly spent each week in working. Nor did it attempt to apply the regular rate to the first 40 hours actually and regularly worked. Instead the plan provided for a fictitious regular rate consisting of a figure somewhat lower than the rate actually received. This illusory rate was arbitrarily allocated to the first portion of each day's regular labor; the latter portion was designated 'overtime' and called for compensation at a rate one and one-half times the fictitious regular rate. Thus when an

employee on regular eight hour tours had actually worked 40 hours, respondent could point to the employee's contract and claim that he had worked only 20 'regular' hours and 20 'overtime' hours. Hence he was entitled to no additional remuneration for work in excess of 40 hours except in the unlikely situation, which never in fact occurred, of his actually working more than 80 hours. The vice of respondent's plan lay in the fact that the contract regular rate did not represent the rate which was actually paid for ordinary, non-overtime hours, nor did it allow extra compensation to be paid for true overtime hours. It was derived not from the actual hours and wages but from ingenious mathematical manipulations, with the sole purpose being to perpetuate the pre-statutory wage scale. *Walling v. Helmerich & Payne*, 323 U.S. 37, 41, 65 S. Ct. 11, 13-14, 89 L. Ed. 29 (1944)

For the reasons contained herein, LaGreca's motion for summary judgment as it pertains to the statute of limitations on Goulas's FLSA claims should be DENIED.

### *D. Goulas's Claims Under the Louisiana Whistleblower Act Should be Maintained As LaGreca Has Misinterpreted the Statute*

The rule of law governing the Louisiana Whistleblower Act is La. Rev. Stat. 23:967 which states:

A. An employer shall not take reprisal against an employee who in good faith, and after advising the employer of the violation of law:

(1) Discloses or threatens to disclose a workplace act or practice that is in violation of state law.

(2) Provides information to or testifies before any public body conducting an investigation, hearing, or inquiry into any violation of law.

(3) Objects to or refuses to participate in an employment act or practice that is in violation of law.

Goulas made a good faith disclosure to LaGreca on numerous occasions that Lyons was abusing drugs in the workplace. Neal objected to Lyons (the admitted drug user) being hired at LaGreca Services. LaGreca did not ask Goulas' opinion on the matter. In fact, LaGreca scolded Goulas for giving his opinion regarding the hiring of Lyons by stating "don't put me in that position. Don't tell me what to do with my company." LaGreca further testified, "Because Neal had voiced his opinion, and even though I wasn't going to let him tell me what to do, I tried to keep the peace. Because he said if John Lyons starting working for the company, he was quitting." (LaGreca Tr. 21:2 -22:25) LaGreca admits it terminated Goulas after hearing a telephone call in which Goulas accidentally dialed LaGreca while having a conversation with his wife Jennifer. (Rec. Doc. 47-2 ¶ 29). LaGreca admits it immediately called a meeting with Goulas the next morning after overhearing this phone call. (Rec. Doc. 47-2 ¶ 30). LaGreca admits there is causation between the phone call he overheard and Goulas's termination. (Rec. Doc. 47-2 ¶ 31). LaGreca admits Goulas again disclosed Lyon's drug use at his termination meeting. (Rec. Doc. 47-2 ¶ 32). LaGreca unsuccessfully argues that Goulas never threatened to disclose this violation of state law to a third party; but LaGreca overlooks the fact that he has admitted that Goulas was terminated for disclosing the issue to his wife Jennifer. These facts, to which LaGreca has admitted, satisfy the elements of La. Rev. Stat. § 23:967 Goulas plans to further satisfy the requirement of proving an actual violation of state law by calling John Q. Lyons to testify at trial and/or introducing his affidavit in his motion for summary judgment.

The record clearly shows that Goulas advised his employer, LaGreca, of a violation of state law to place him on notice. The record further shows Goulas continued to disclose the

violation to LaGreca and his wife. Goulas's disclosure of this violation of state law to his wife was overheard by LaGreca and it admits to terminating Goulas for same. For these reasons, LaGreca's motion for summary judgment as it pertains to Goulas's whistleblower claims should be dismissed.

### *E. Charles P. LaGreca, Jr., Individually, Is an Employer* as defined by 29 U.S.C. § 203(d).

Goulas was employed by both LaGreca Services, Inc. and Charles P. LaGreca as defined by 29 U.S.C. § 203(d). An " '[e]mployer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). The Fifth Circuit uses the "economic reality" test to evaluate whether there is an employer/employee relationship. *See, e.g.*, *Williams v. Henagan*, 595 F.3d 610, 620 (5th Cir. 2010); *Watson v. Graves*, 909 F.2d 1549, 1553 (5th Cir. 1990). The test originates in the Supreme Court's holding that "economic reality" should govern the determination of employer status under the FLSA. *Goldberg v. Whitaker House Coop.*, 366 U.S. 28, 33, 81 S. Ct. 933, 936 (1961). To determine whether an individual or entity is an employer, the court considers whether the alleged employer: "(1) possessed the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Williams*, 595 F.3d at 620. In cases where there may be more than one employer, this court "must apply the economic realities test to each individual or entity alleged to be an employer and each must satisfy the four part test." *Graves*, 909 F.2d at 1556.

Charles P. LaGreca, Jr., individually, was solely responsible for the hiring and firing of employees at LaGreca Services. (Prevost Tr. 23:12-17, LaGreca Tr. 22:22-24 and 27:9-14). LaGreca supervised and controlled employee work schedules and determined their method and rate of pay. (LaGreca Tr. 8:17-25). Lastly, LaGreca has admitted in his affidavit that he is

responsible for maintaining the employment records for LaGreca's Services employees. (LaGreca Affidavit (LaGreca's Ex. A.).

For these reasons, LaGreca's motion for summary judgment as it pertains to Charles P. LaGreca's individual liability as an employer should be dismissed.

II. CONCLUSION

For all the reasons contained herein, LaGreca's motion for summary judgment should be dismissed in its entirety.

**RESPECTFULLY SUBMITTED,**

SMITKO LAW, APLC

BY: s/ Jerri G. Smitko
Jerri G. Smitko #l7807
Catherine R. Gauthier #29580
Jacques A. Beebe #27180
622 Belanger Street
P. O. Box 1669
Houma, LA 7036l
Telephone: (985) 851-1313
Facsimile: (985) 851-1250

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and foregoing Notice of Submission has been served upon counsel of record by electronic filing in the CM/ECF for the Eastern District of Louisiana on this 9th Day of April, 2013.

/s/ Jerri G. Smitko

Law Notes to Use