UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| NEAL P. GOULAS | * |
| | *   CIVIL ACTION NO.: 12-898 |
| Plaintiff, | * |
| | * |
| v. | *   JUDGE: FALLON "L" |
| | * |
| LAGRECA, INC., LAGRECA SERVICES, | * |
| INC. D/B/A LAGRECA | *   MAGISTRATE: WILKINSON (2) |
| TRANSPORTATION, & CHARLES P. | * |
| LAGRECA, JR. | * |
| | * |
| Defendants. | * |
| | * |

* * * * * * * * * * * * * * * * * * * * * * * * * *

## CHARLES P. LAGRECA, JR. AND LAGRECA SERVICES, INC.'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Charles P. LaGreca, Jr., individually ("LaGreca"), and LaGreca Services, Inc. ("Services") (collectively, "Defendants") respectfully submit the following proposed findings of fact and conclusions of law for the Court's consideration in connection with the trial in this matter. For the reasons that follow, the Court should find that Services is entitled to recover $992.81 in damages as a result of Plaintiff Neal Goulas' breach of contract for failure to repay salary advances made to him during his employment with Services, and, further, that the Court should dismiss Plaintiff's FLSA claims against Defendants, with prejudice.

## I.   PROPOSED FINDINGS OF FACT

**A.   Services' Work and Supervisor Compensation System**

1. Services, founded by LaGreca in 1996, is a small, family-run horizontal directional drilling company. *See* Order and Reasons on Defendants Motion for Summary Judgment ("Order on MSJ"), Rec. Doc. 60, at 1; Proposed Joint Pretrial Order Listing of Uncontested Facts ("Pretrial Order"), Rec. Doc. 59, at 10-11.

2. In addition to clerical staff, shop employees, and LaGreca himself, Services employs a crew (or sometimes two crews) of between four and six employees who perform drilling work for customers (who are usually general contractors). Order on MSJ at 1. Each crew is supervised by a Superintendent. *See* Pretrial Order at 10; Joint Exhibit 7.

3. Depending on whether Services has a drilling project in the field on any given week, its employees' hours can vary dramatically. *See* Order on MSJ at 2; *see generally*, Joint Exhibits 1-5.

4. In an effort to provide its top employees – primarily the crew Superintendent(s) – with a consistent and reliable income, Services gave them the choice of being paid hourly or being paid an annual salary. Expected trial testimony of Charles P. LaGreca, Jr. ("LaGreca testimony"); Expected trial testimony of Neal Goulas ("Goulas testimony").

5. This compensation was calculated by alternating between paying the supervisors for 68 and 68.5 hours of work per week, with a base pay rate applicable for the first 40 hours of work per week, and a triple overtime rate applicable for the additional hours of salaried work. LaGreca testimony; Joint Exhibits 2-5.

2

6. Nevertheless, in most weeks the supervisors, including Goulas, did not work the 68 / 68.5 hours for which they were paid. *Infra* at ¶¶ 18 & 24; Joint Exhibits 1-5 (timecards).

7. Services was, in effect, paying its supervisors an average of 68 to 68.5 hours per week, when in reality they averaged fewer than 60 hours per week, and only in a few weeks per year did they actually work more than the 68 / 68.5 hours for which they were paid. In doing so, Services provided Goulas, and Goulas requested, a guaranteed salary providing this steady and reliable income. LaGreca testimony; Goulas testimony; Joint Exhibits 1-5; *infra* at ¶¶ 18 & 24.

8. Services sought and followed outside advice when implementing this supervisor compensation system. LaGreca testimony.

**B.  Services' Hires Goulas and Quickly Promotes Him to Superintendent**

9. Services hired Goulas in February of 2007 based on his family relationship with LaGreca as well as his experience working on a Services drilling crew during the summer of 2002 and his later experience working for other drilling and oil and gas companies. *See* Order on MSJ at 1; LaGreca testimony.

10. LaGreca hoped to quickly promote Goulas to Superintendent and, eventually, for Goulas to become his successor as Services' President. Pretrial Order at 10-11; LaGreca testimony.

11. At his hiring Goulas chose to receive a salary instead of being paid hourly. Pretrial Order at 10-11; LaGreca testimony; Goulas testimony.

12. Just months later, on or about January 1, 2008, Services made Goulas a Superintendent, and he remained in that position until he went on military leave on April 6, 2008. Pretrial Order at 10-11; *see also* Order on MSJ at 1.

13. Goulas received a $35,000 raise when he became Superintendent. *See* Joint Exhibit 8; LaGreca testimony; Goulas testimony.

14. Goulas' salary as Superintendent was $65,525.00. *See* Joint Exhibits 1-5 & Exhibit 4 at 130.

15. Services paid Goulas approximately $65,525 annually per the above-described compensation system from October 12, 2008 through the end of his employment, with adjustments for bonuses, salary advances, and salary advance repayments. *See* Pretrial Order at 10-11; Joint Exhibits 1-5.

C. **Goulas' Hours and Pay from October 12, 2008 through Mid-2009**

16. Goulas served as shop foreman, and Superintendent of Services' second crew during weeks and projects when the second crew was needed, from August 3, 2008 to mid-2009. LaGreca testimony; Goulas testimony.

17. During this time, Goulas was compensated at the same salary he received as a full-time Superintendent. Joint Exhibits 1-5.

18. Goulas was paid at least 68 to 68.5 hours per week during this period, including 28 to 28.5 hours of overtime pay per week.[1] Joint Exhibits 2-3; LaGreca testimony.

---

[1] From April 5, 2009 to May 30, 2009, Goulas actually paid for between 76 and 76.5 hours per week. Joint Exhibit 3.

19.     During this time, Goulas only worked more hours than he was compensated for in a given week three times, totaling 28.75 additional hours:

| Pay Period End Date | Timecard Hours | Hours Paid[2] | Difference | Joint Exhibit # |
|---|---|---|---|---|
| 10/18/2008 | 81.75 | 68 | 13.75 | 1 at 231, 328 |
| 10/25/2008 | 78 | 68 | 10 | 1 at 233, 328 |
| 12/6/2008 | 73 | 68 | 5 | 2 at 71, 245 |
|  |  | **TOTAL** | **28.75** |  |

Joint Exhibits 1-3.

20.     Moreover, Goulas was serving as Superintendent during each of these weeks as Services had multiple jobs and crews working at once and needed an additional supervisor for those crews.  LaGreca testimony.

21.     In all, during this nine month period from October 12, 2008 to June 27, 2009, Goulas performed 2,636.55 hours of work, but was compensated for 3,116.50 hours, almost 480 hours more than his actual hours worked.  Joint Exhibits 1-3.

22.     For each week from October 12, 2008 to June 27, 2009 that Goulas worked more than the number of hours for which he was compensated, Services had already prepaid him for these hours because he worked many hours fewer than he had been compensated for in the prior weeks.  Joint Exhibits 1-3, 10.

---

[2]     Because Goulas was in the midst of repaying a salary advance at the time, his 10/18/08 and 10/25/08 paystubs do not indicate the hours covered by these paychecks, however the paycheck amount exceeds half of the amount paid for 68 or 68.5 hours.  LaGreca testimony.

**D.      Goulas' Hours and Pay from June 28, 2009 through May of 2010**

23.     Goulas also served as Superintendent from at least June of 2009 through the end of his employment in early May, 2010.  Order on MSJ at 1; Pretrial Order at 10-11; Goulas testimony; LaGreca testimony.

24.     Goulas was paid between 68 and 68.5 hours per week during this period, including 28 to 28.5 hours of overtime pay per week.  Joint Exhibits 4-5; LaGreca testimony.

25.     During this time, Goulas only worked more hours than he was compensated for in a given week eight times, totaling 55.75 additional hours:

| Pay Period End Date | Timecard Hours | Hours Paid | Difference | Joint Exhibit # |
|---|---|---|---|---|
| 7/18/2009 | 89.25 | 68.5 | 20.75 | 4 at 106, 198 |
| 7/25/2009 | 69.75 | 68 | 1.75 | 4 at 107, 196 |
| 8/29/2009 | 69.25 | 68.5 | 0.75 | 4 at 112, 190 |
| 9/26/2009 | 83 | 68.5 | 14.5 | 4 at 116, 182 |
| 10/31/2009 | 73.75 | 68 | 5.75 | 4 at 121, 172 |
| 11/7/2009 | 72 | 68.5 | 3.5 | 4 at 122, 170 |
| 3/6/2010 | 71.5 | 68 | 3.5 | 5 at 140, 259 |
| 3/13/2010 | 73.75 | 68.5 | 5.25 | 5 at 141, 260 |
|  |  | **TOTAL** | **55.75** |  |

*See* Joint Exhibits 4-5.

26.     In all, during this eleven month period from June 28, 2009 to May 8, 2010, Goulas performed 2,667.75 hours of work, but was compensated for 3,071.5 hours, over 400 hours more than his actual hours worked.  Joint Exhibits 4-5.

27.     For each week from June 28, 2009 to May 8, 2010 that Goulas worked more than the number of hours for which he was compensated, Services had already prepaid him for these

6

hours because he worked many hours fewer than he had been compensated for in the prior weeks. Joint Exhibits 4-5.

### E.  Overall, Goulas Was Compensated for Many More Hours than He Worked

28.  Thus, Goulas only exceeded the number of hours for which he was compensated in 11 weeks from October 12, 2008 through the end of his employment (as opposed to at least 53 weeks in which his salary covered more hours than he worked). Joint Exhibits 1-5.

29.  In those 11 busy weeks, Goulas only worked a cumulative total of 84.5 hours above and beyond those that his salary already covered (*i.e.* above and beyond the 68/68.5 hours included in his salaried pay). Joint exhibits 1-5.

30.  Furthermore, the 84.5 extra hours Goulas worked during his busy weeks are dwarfed by the 885.7 hours that his salary covered but that *he did not work* during the slow weeks. *See* Joint Exhibits 1-5.

### F.  Goulas Received a Weekly Salary of More than $455 As Superintendent

31.  Goulas earned a salary of at least $455 per week while serving as Superintendent. *See* Joint Exhibits 1-5.

### G.  Goulas' Primary Duties As Superintendent Were Management-Related

32.  As Superintendent, Goulas' responsibilities primarily involved management duties such as employee supervision and direction, assigning job duties to his crew, attending weekly supervisor meetings and strategy sessions, daily paperwork and reports, client communications, and tracking supplies and materials. LaGreca testimony; *see* Pretrial Order; Goulas testimony.

33. As Superintendent, Goulas attended weekly supervisor meetings with LaGreca, at which they would review the progress made on current jobs, discuss staffing issues, and formulate strategies for completing upcoming jobs. LaGreca testimony; Goulas testimony.

34. As Superintendent, Goulas was solely responsible for drafting daily reports and analyses documenting the crew's work, progress, and problems encountered. Order on MSJ at 1-2; Pretrial Order at 10-11; LaGreca testimony; Goulas testimony.

35. As Superintendent, Goulas was also responsible for tracking and ensuring that the crew had sufficient supplies and materials for their work. Order on MSJ at 1-2; Pretrial Order at 10-11; LaGreca testimony; Goulas testimony.

36. As Superintendent, Goulas was the most senior Services employee in the field. LaGreca did not directly supervise Goulas while the latter and his crew were in the field and would normally only be on a job site with Goulas and his crew for one hour per week. LaGreca testimony; Goulas testimony.

37. As Superintendent, Goulas trained new employees on how to safely and efficiently use their equipment and perform their duties. LaGreca testimony.

38. As Superintendent, Goulas was responsible for delegating field work to the members of his crew, and assigning them tasks to perform on a daily basis. LaGreca testimony.

39. As Superintendent, Goulas was responsible for communicating with onsite clients, usually general contractors, responding to their concerns, and directing the members of his crew in how to perform the tasks needed to respond to the client's concerns. LaGreca testimony.

**H.     As Superintendent, Goulas Directed the Work of At Least Two Employees**

40.    It is uncontested that, as Superintendent, Goulas customarily and regularly directed the work of at least two employees.  Order on MSJ at 12.

**I.     Services Gave Particular Weight to Goulas' Opinions Regarding His Crew**

41.    Services gave particular weight to Goulas' opinions regarding his crew, including their hiring, firing, and promotion.  LaGreca testimony.

42.    Whenever Goulas provided Services with his opinions regarding possible hirings, firings, promotions or demotions, Services gave strong consideration to that input.  LaGreca testimony.

43.    In early 2010, for example, LaGreca asked Goulas' opinion regarding the possible hiring of John Lyons.  LaGreca testimony; Goulas testimony.

44.    When Goulas objected based on Lyons' reputation as a drug user and recently completed prison sentence, Services refused to hire Lyons until he demonstrated that he had cleaned up his act by performing menial labor and taking a drug test.  LaGreca testimony; Goulas testimony.

**J.     Goulas Fails to Repay Two Salary Advances Related to his Military Leave**

45.    Goulas was on military leave from April 6, 2008 to August 2, 2008, during which time he did no work for Services.  *See* Pretrial Order; LaGreca testimony; Goulas testimony.

46.    Services agreed to advance Goulas a partial salary while he was on military leave to support his wife, who was pregnant at the time.  *See* Pretrial Order; Joint Stipulation No. 1; LaGreca Exhibit 1.

47.     In return, Goulas agreed to work at the same partial salary for the same number of weeks upon his return.  Pretrial Order; Joint Stipulation No. 1.

48.     However, Goulas was advanced a partial salary of $692.31 per week for 17 weeks but only worked at the partial salary for 16 weeks.  Pretrial Order; Joint Stipulation No. 1; Joint Exhibits 1, 9-10.

49.     The difference between the salary advance and the amount repaid is $692.31.  *See* Joint Stipulation No. 1; Joint Exhibits 1, 9-10.

50.     Upon the conclusion of his military leave, on or about July 28 or July 30, 2008, Services agreed to allow Goulas to use his LaGreca Services Inc. corporate credit card to purchase airfare to return home.  LaGreca testimony; Joint Stipulation No. 2.

51.     In return, Goulas agreed to repay the amount of the airfare as a salary deduction. LaGreca testimony.

52.     Nevertheless, Goulas failed to repay the cost of the airfare, which totaled $300.50. LaGreca testimony; *see* Pretrial Order at 10-11; Joint Stipulation No. 2.

## II.     PROPOSED CONCLUSIONS OF LAW

**A.     Goulas' Compensation as Superintendent is Exempt From the FLSA**

1.     The FLSA does not apply to employees employed in executive or administrative capacities.  29 U.S.C. § 213.

2.     To determine whether an employee is exempt from the FLSA, Courts look to the employee's salary and duties, and "[c]oncurrent performance of exempt and nonexempt work does not disqualify an employee" from exemption if his or her "primary duties" involve the

exempt work.  29 C.F.R. § 541.2 (regarding focus on duties and salary); 29 C.F.R. § 541.106& .700 (regarding concurrent work).

3. For the executive exemption to apply, the employee must: 1) receive a salary of more than $455 per week; 2) have as his primary duty management of a subdivision of the enterprise; 3) customarily and regularly direct the work of at least two employees; and 4) have hiring and firing authority or have his opinions on hiring, firing, and the like be given particular weight by the employer.  29 C.F.R. § 541.100.

4. For the administrative exemption to apply, the employee must: 1) receive a salary of more than $455 per week; 2) have as his primary duty "non-manual work directly related to the management or general business operations of the employer"; and 3) have as his primary duty "the exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 541.200.  FLSA regulations note that an exempt administrative employee includes one "who leads a team of other employees assigned to complete major projects for the employer."  29 C.F.R. § 541.203.

5. When determining whether an employee is exempt from the FLSA, Courts also consider any significant discrepancy between the putatively exempt employee's salary and the pay of other employees to be a factor supporting exempt status.  29 C.F.R. § 541.700 ("Factors to consider when determining the primary duty of an employee include… the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee."); *see Rainey v. McWane Inc.*, 314 F. App'x 693, 695 (5th Cir.

11

2009) ("Finally, the salaried production supervisors were paid more than double what the regular workers in their units were paid.").

6.     Goulas is exempt from the FLSA because, as Superintendent, his primary duties involved exempt work and he meets the other requirements of both the executive and administrative exemptions.

**B.     If Goulas is Not Exempt, the Hours He Worked That Are Not Already Covered By His Salary Are More Than Offset By the Hours That His Salary Covered But That He Did Not Work**

7.     A nonexempt employee who receives pay for a guaranteed number of overtime hours but works more hours that the number guaranteed in a given pay period is only entitled to additional overtime compensation for those additional hours worked above and beyond the guaranteed number.  *Walling v. A. H. Belo Corp.*, 316 U.S. 624, 631 (1942).

8.     In that case, the overtime rate is calculated by multiplying the number of overtime hours worked for which the employee was not properly compensated by 1.5 times the "regular rate of pay."  *Singer v. City of Waco, Tex.*, 324 F.3d 813, 824 (5th Cir. 2003).  The regular hourly rate for salaried employees is computed by dividing the salary by the number of hours which the salary is intended to compensate, including overtime.  *Id.*

9.      Defendants are entitled to offset any unpaid overtime damages due Goulas for his FLSA claims arising from the few busy weeks in which he worked more than 68 / 68.5 hours by the amount of overtime paid to Goulas but for which he did not work in other weeks.  *Singer*, 324 F.3d at 828.

10.     Although overtime compensation "generally" should be paid in the same work period in which the work is performed, the provision does not prohibit an employer from paying overtime compensation in advance.  *Id.*

11.     By overpaying Goulas in the overpayment periods, Services was compensating him in advance for the shortfalls in other periods.  *See id.*

12.     Any damages due Goulas for his FLSA claims are more than offset by Services' prepayment of overtime to Goulas.

13.     Defendants acted in good faith and had reasonable grounds to believe that their actions complied with the FLSA, therefore Goulas shall not recover any liquidated damages under the FLSA.  *Singer*, 324 F.3d at 822-23; *see* 29 U.S.C. § 260.

C.    **Plaintiff Breached His Contract to Repay Services for His Salary Advances**

14.     Goulas breached his contract with Services by failing to repay Services for $692.31 in salary advances for living expenses made during his military leave in 2008.

15.     Goulas breached his contract with Services by failing to repay Services for $300.50 in airfare he purchased using Services' corporate credit card in order to return home from military leave in July of 2008.

16.     Services is therefore entitled to judgment against Goulas in the amount of $992.81 plus judicial interest.

Respectfully submitted,

*/s/ Brad Cousins*
H. Minor Pipes, III, 24603
Brad Cousins, 32408
BARRASSO USDIN KUPPERMAN
  FREEMAN & SARVER, L.L.C.
909 Poydras Street, 24th Floor
New Orleans, Louisiana  70112
Telephone:  504-589-9700
Facsimile:  504-589-9701
Email:   mpipes@barrassousdin.com
Email:   bcousins@barrassousdin.com

And

Randall M. Alfred, 2387
A Professional Law Corporation
106 Ramey Road
Houma, Louisiana 70360
Telephone: (985) 876-4292

*Attorneys for Charles P. LaGreca, Jr. and LaGreca Services, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing pleading has been served upon all counsel of record by facsimile, hand delivery, electronic mail, and/or placing same in the United States mail, postage prepaid and properly addressed, this 14th day of May, 2013.

*/s/ Brad Cousins*

{864520_1}