**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **NEAL P. GOULAS** | **CIVIL ACTION** |
| **VERSUS** | **NO. 12-898** |
| **CHARLES P. LAGRECA, JR., ET AL.** | **SECTION "L" (2)** |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**PROCEDURAL HISTORY**

Plaintiff Neal Goulas ("Goulas") brings this action for unpaid overtime and wrongful termination against his former employer, Defendant LaGreca Services, Inc. ("Services"), doing business as LaGreca Transportation, and its owner, Defendant Charles P. LaGreca, Jr. ("LaGreca"). LaGreca is Goulas' uncle and the founder of Services, a horizontal directional drilling company. Services employs crews of four to six employees, who perform drilling work. Goulas began working on one of these crews in February 2007. In either late 2007 or early 2008, Goulas was promoted to the position of superintendent and received a corresponding pay increase. Goulas also worked as a superintendent from mid-2009 until May 2010. Plaintiff's employment was terminated in May 2010, following the hiring of another employee, John Lyons. During a meeting with LaGreca, Goulas complained to him about alleged drug use by his co-worker. By the end of that meeting, Goulas' employment with Services had ended.

Goulas brought suit on October 18, 2010 in the 32nd Judicial District Court for the Parish of Terrebonne. His Petition for Damages alleges that he was never compensated for 20 or more hours of overtime that he was working each week. (Rec. Doc. 1-1 at p. 2, ¶ 2). Furthermore,

1

Goulas alleges that he was fired in retaliation after he reported a safety violation and/or the use of drugs on the premises. *Id.* at ¶ 3. He requests "past due wages, vacation pay, bonus, penalty wages, and attorney fees pursuant to Louisiana law." *Id.* at p. 3, ¶ 9.

On November 4, 2010, Defendants filed Dilatory and Peremptory Exceptions, alleging, essentially, that Goulas had incorrectly named the Defendants in his Petition. *Id.* at pp. 5-6. Goulas amended his Petition to remedy this deficiency, *id.* at pp. 8-9, and Defendants filed an Answer and Reconventional Demand, alleging that Goulas was a salaried exempt employee and that no safety violation had occurred, *id.* at pp. 13-14, ¶¶ 2-3. Defendants brought their Reconventional Demand against Goulas and his wife, Jennifer Goulas, based on a balance allegedly due on a promissory note and for various other allegedly unpaid personal loans. *Id.* at pp. 15-16, ¶¶ 9-13.

On March 8, 2012, the Goulases filed Peremptory Exceptions in response to LaGreca's reconventional demand. *Id.* at pp. 20-27. In that filing, the Goulases indicated for the first time that Mr. Goulas was bringing suit for "Failure to Pay Overtime in accordance with the Fair Labor Standards Act." *Id.* at p. 22. On April 5, 2012, Defendants removed the case to this Court, asserting federal question jurisdiction. (Rec. Doc. 1 at ¶ 14). This Court previously granted Defendants leave to amend their counterclaims (Rec. Doc. 18), but on April 1, 2013, after Defendants conceded that the Court lacked subject matter jurisdiction, all counterclaims except the claim for unpaid salary advances were remanded to state court. (Rec. Doc. 46).

On April 2, 2013, Defendants filed a motion for summary judgment on Goulas' claims. (Rec. Doc. 47). Defendants argued principally that Gouals was exempt from FLSA's overtime provisions because as a superintendent for Services, he was employed in a bona fide executive

capacity. Defendants also argued, *inter alia*, that some of Goulas' FLSA claims were time barred and that he was unable to recover under the Louisiana Whistleblower Statute. On May 10, 2013, the Court issued an Order and Reasons granting Defendants' motion in part. (Rec. Doc. 60). The Court held that genuine issues of material fact remained with respect to whether Goulas qualified for the executive exemption, but dismissed Goulas' whistleblower claims and FLSA claims predating October 12, 2008 on the grounds argued by Defendants.

On May 20, 2013, the Court held a bench trial on Goulas' remaining FLSA claim and Defendants' counterclaim for unpaid salary advances. The Court has carefully considered the testimony of all of the witnesses and the exhibits entered into evidence during the trial, as well as the record. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court issues the following Findings of Fact and Conclusions of Law. To the extent that any finding of fact may be construed as a conclusion of law, the Court hereby adopts it as such, and to the extent that any conclusion of law constitutes a finding of fact, the Court adopts it as such.

Furthermore, the Court adopts all previous findings of fact listed in its May 20, 2013 Order and Reasons. (Rec. Doc. 60).

**FINDINGS OF FACT**

**A.    Goulas' Employment at Services**

(1)

LaGreca is Goulas' uncle. (O&R, Rec. Doc. 60 at 1).

(2)

 LaGreca founded Services, a family-run horizontal directional drilling company, in 1996. (Rec. Doc. 60 at 1).

(3)

LaGreca is the President of Services. (LaGreca Test.).

(4)

In addition to clerical staff, shop employees, and LaGreca himself, Services employs a

crew (or sometimes two crews) of between four and six employees who perform drilling work.

(O&R, Rec. Doc. 60 at 1).

(5)

Each crew has a Superintendent. (LaGreca Test.).

(6)

Services hired Goulas in February of 2007. (O&R, Rec. Doc. 60 at 1).

(7)

At that time, Goulas had just left the Army, and had asked LaGreca for work at Services.

(LaGreca Test.).

(8)

Goulas' only education at that time was a G.E.D. (Goulas Test.).

(9)

Goulas had previously worked for LaGreca for about 6 months in 2002. (Goulas Test.).

(10)

Soon after hiring Goulas in 2007, LaGreca told Goulas that he hoped to promote Goulas

to Superintendent, and eventually, for Goulas to become his successor as Services' President.

(LaGreca Test.).

4

(11)

Around January 9, 2008, Services promoted Goulas to Superintendent. (Joint Ex. 8 at 2).

(12)

Goulas remained a Superintendent until he left the company to return to the military on April 6, 2008. (LaGreca Test.; Goulas Test.).

(13)

From April 6, 2008 until August 1, 2008, Goulas was on military leave and performed no work for the company. (LaGreca Test.; Goulas Test.).

(14)

As described below, Goulas received salary advances during this period. (LaGreca Test.; Goulas Test.).

(15)

Goulas returned to work as a Superintendent for Services in August 2008. (LaGreca Test.; Goulas Test.).

(16)

Because there was another Superintendent at that time, Goulas worked as both a Superintendent and a Shop Foreman, depending on the amount of field work available in a given week. (LaGreca Test.).

(17)

Goulas remained employed as a Superintendent until May 2010. (O&R, Rec. Doc. 60 at 2).

**B.      Goulas' Duties at Services**

(18)

As Superintendent, Goulas had a combination of managerial and non-managerial responsibilities. (LaGreca Test.; Luke Test.; Pierron Test.; Goulas Test.).

(19)

For example, Goulas was responsible for drafting daily reports for LaGreca, which documented the crew's work, progress, and problems encountered. (LaGreca Test.; Pierron Test.; Goulas Test.).

(20)

These reports took approximately 5 minutes for Goulas to complete each day, and Goulas usually submitted them via text message or email. (LaGreca Test.; Goulas Test.).

(21)

Goulas also attended weekly supervisor meetings with LaGreca, at which Goulas and LaGreca would review the progress on current jobs, discuss staffing issues, and formulate strategies for upcoming jobs. (LaGreca Test.; Luke Test.)

(22)

Sometimes, other employees attended these meetings also. (Luke Test.; Pierron Test.).

(23)

Goulas compiled drilling plans on Auto CAD. (LaGreca Test.; Goulas Test.).

(24)

Goulas was at least partially responsible for tracking and ensuring that the crew had sufficient supplies and materials for their work. (LaGreca Test.).

6

(25)

Goulas had some responsibility for directing the work of the 3 other employees on his crew, including delegating tasks to the crew. (LaGreca Test.; Luke Test.; Pierron Test.).

(26)

One particular employee, Paul Trahan, would always mix mud, and Goulas may not have been able to change his assigned responsibility. (Luke Test.; Goulas Test.).

(27)

However, Goulas delegated responsibilities to the rest of his crew, including himself. (Luke Test.; Goulas Test.).

(28)

While Goulas and the other employees on his crew did not always agree, Goulas was the authority "on paper" and had ultimate responsibility over the crew. (Luke Test.; Goulas Test.).

(29)

The rest of Goulas' crew viewed him as the "go-to guy" if problems came up. (Luke Test.; Pierron Test.).

(30)

Goulas also assisted with training new crew members, although the other crew members also helped to train new workers. (Luke Test.; Goulas Test.).

(31)

LaGreca spent a maximum of 30 minutes per week in the field, and usually much less than that. (LaGreca Test.; Luke Test.; Pierron Test.).

(32)

Thus, for the majority of the time in the field, Goulas was the highest-ranking employee present. (LaGreca Test.; Pierron Test.).

(33)

Goulas reported directly to LaGreca, and other members of his crew reported either to Goulas or to LaGreca. (LaGreca Test.; Goulas Test.).

(34)

On at least some occasions, Goulas communicated with Services' customers. (LaGreca Test.; Luke Test.).

(35)

At one time, Goulas informed LaGreca that Franklin de los Santos, one of Goulas' Army friends, was looking for work, and LaGreca subsequently hired him. (LaGreca Test.; Goulas Test.).

(36)

On another occasion, Goulas requested that LaGreca terminate a Services employee after Goulas saw the employee steal a bag of peanuts from a convenient store while the crew was on the way to a job. (LaGreca Test.; Goulas test.).

(37)

After viewing security camera footage that confirmed these allegations, LaGreca terminated the employee. (LaGreca Test.; Goulas Test.).

(38)

In January 2009, after two customers cancelled large jobs, Services experienced a slow

period during which no field work was available, and as a result, Services had to cut some of its employees. (LaGreca Test.).

(39)

Goulas had at least some opportunity to express his opinion regarding whom Services should keep and whom it should let go. (LaGreca Test.; Goulas Test.).

(40)

LaGreca's firing decisions aligned at least partially with Goulas' opinion on this matter. (LaGreca Test.; Goulas Test.).

(41)

However, Goulas did not have independent power to hire and fire employees. (Luke Test.; Pierron Test.; Goulas Test.).

(42)

Goulas also did not have the authority to enter into contracts with customers. (Pierron Test.).

(43)

In the field, Goulas was not just a finger pointer, but participated in the crew's work. (LaGreca Test.; Luke Test.; Pierron Test.; Goulas Test.).

(44)

Goulas usually wore steel-toed shoes, blue jeans, and a t-shirt to work each day. (Goulas Test.).

(45)

He and the rest of the crew also wore hard hats sometimes. (Goulas Test.).

(46)

Goulas' manual-labor duties in the field included operating machinery, loading pipe, mixing mud, and locating. (LaGreca Test.; Pierron Test.; Goulas Test.).

(47)

Goulas also had other manual labor duties at times, including cutting brush, loading equipment, driving an 18-wheeler, and welding. (Goulas Test.).

(48)

Goulas' most common delegated responsibility was locating, and while he was doing this, he was physically separated from the rest of his crew. (Goulas Test.).

(49)

When Goulas was not in the field, he spent time both working in the shop and working in the office. (LaGreca Test.).

(50)

Goulas received training for his work at Services on the job, and did not receive any specialized schooling or training outside of this on-the-job training. (Goulas Test.).

**C.    Goulas' Termination from Services**

(51)

Shortly before Goulas stopped working for Services, LaGreca hired John Lyons, first as a personal employee for LaGreca, and then as a Services employee. (LaGreca Test.).

(52)

Lyons is LaGreca's brother-in-law and Goulas' stepfather. (LaGreca Test.).

10

(53)

Lyons approached LaGreca to ask for work after completing a term of imprisonment for a drug-related offense. (LaGreca Test.).

(54)

Initially, Goulas objected to LaGreca's hiring Lyons and threatened to quit if LaGreca did in fact hire Lyons. (LaGreca Test.).

(55)

As a result, LaGreca initially declined to hire Lyons. (LaGreca Test.).

(56)

However, a few weeks later, Lyons asked LaGreca for work again, and this time, LaGreca hired Lyons to work for him in a personal capacity. (LaGreca Test.).

(57)

Approximately six weeks to two months later, Services needed one or two additional employees to complete a big job, and LaGreca hired Lyons as a temporary Services employee. (LaGreca Test.).

(58)

Soon after Lyons was hired, Goulas accidentally called LaGreca, and LaGreca overheard Goulas making critical comments about LaGreca. (O&R, Rec. Doc. 60 at 2).

(59)

The next day, LaGreca met with Goulas, and during the meeting, Goulas complained to LaGreca about alleged drug use by Lyons. (O&R, Rec. Doc. 60 at 2).

(60)

During the meeting, LaGreca said to Goulas, "Don't tell me what to do with my company." (LaGreca Test.).

(61)

By the end of that meeting, Goulas' employment with Services had terminated. (O&R, Rec. Doc. 60 at 2).

(62)

Goulas' termination occurred around May 8, 2010. (Joint Ex. 5 at 150; Joint Ex. 6 at 2; Joint Ex. 8 at 5).

**D.      Goulas' Compensation at Services**

(63)

Services' employees' hours vary dramatically from week to week, depending on whether Services has a drilling project in the field. (O&R, Rec. Doc. 60 at 2).

(64)

Due to this variation, Services gave some of its employees, including its Superintendents, the choice of being paid hourly or being paid an annual salary. (LaGreca Test.; Luke Test.; Pierron Test.; Prevost Test.; Goulas Test.).

(65)

Goulas chose to be paid an annual salary because LaGreca told him that he would make less money if he were paid on an hourly basis. (LaGreca Test.; Prevost Test.; Goulas Test.).

(66)

Services' salaried employees, including Goulas, submitted timecards each week

12

reflecting the hours that they actually worked. (LaGreca Test.; Luke Test.; Prevost Test.; Goulas Test.).

(67)

The hours reported on these timecards did not influence the number of hours for which salaried employees received compensation. (Joint Exs. 1-5, 9, 10).

(68)

In addition to these timecards, Services' salaried employees signed statements reflecting the number of hours for which they received compensation. (Luke Test.; Pierron Test.; Goulas Test.).

(69)

Sometimes, these forms were blank when the salaried employees signed them, and the salaried employees would sometimes sign several at a time. (Pierron Test.; Prevost Test.; Goulas Test.).

(70)

Goulas' compensation was calculated by paying him either 68 or 68.5 hours of work per week, with a base pay rate applicable for the first 40 hours of work per week, and an overtime rate applicable for the additional 28 or 28.5 hours of work per week. (LaGreca Test.; Joint Exhibits 2-5).

(71)

As a Superintendent, Goulas' base pay rate was $10 per hour, and his overtime rate was $30 per hour. (Goulas Test.; Joint Exs. 1-5, 9, 10).

(72)

At one time, Goulas had trouble obtaining financing for a house and asked LaGreca why Services computed its employees' salaries this way. (Goulas Test.).

(73)

LaGreca replied that this compensation scheme resulted in lower worker's compensation premiums. (Goulas Test.; Prevost Test.).

(74)

In order to receive his salary, Goulas was expected to work 60-65 hours per week. (Prevost Test.; Goulas Test.).

(75)

Most weeks, Goulas worked fewer than 68 or 68.5 hours. (Joint Exs. 1-5, 9, 10).

(76)

Goulas was never subject to pay reductions or docking of his pay check when he worked fewer than 60-65 hours per week. (LaGreca Test.; Goulas Test.).

(77)

Goulas received his regular pay during the week between Christmas and New Year's, while Services was usually closed, and on other holidays. (LaGreca Test.; Goulas Test.).

(78)

This added up to an annual salary of $65,525. (LaGreca Test.; Goulas Test.).

(79)

Services' other Superintendent, Paul Trahan, also received a salary of $65,525. (LaGreca Test.)

(80)

Michael Luke, a Superintendent-in-Training, received a salary of $60,000. (Luke Test.).

(81)

Lydell Pierron, another Superintendent-in-Training, received a salary of $40,000. (Pierron Test.).

(82)

Manual laborers working for Services typically received $10-$13 per hour and were paid on an hourly basis, rather than a salary basis. (LaGreca Test.).

(83)

Before being promoted to Superintendent, Goulas received a salary of $35,000. (Goulas Test.).

(84)

As a Superintendent, Goulas also received a Christmas bonus on at least one occasion. (Joint Ex. 2 at 73).

(85)

In those weeks, Goulas was never required to reimburse Services for the additional hours he was paid for, nor was his paycheck docked for the hours that he did not work. (LaGreca Test.; Goulas Test.).

(86)

The weeks in which Goulas worked more than 68.5 hours are listed below.

**1.    October 12, 2008 to June 27, 2009**

(87)

From October 12, 2008 to June 27, 2009, there were three weeks during which Goulas worked more than 68.5 hours. With respect to each of these three weeks, there was a preceding week during which Goulas worked fewer than 68.5 hours, such that he was ultimately compensated for all overtime worked.

(88)

First, during the week of October 18, 2008, he worked 81.75 hours and was paid for 68, resulting in a deficit of 13.75 overtime hours. (Joint Ex. 1 at 231, 328).

(89)

However, during the week of October 4, 2008, he worked 53.75 hours and was paid for 68,[1] resulting in a surplus of 14.25 overtime hours. (Joint Ex. 10 at 227, 327).

(90)

Second, during the week of October 25, 2008, he worked 78 hours and was paid for 68, resulting in a deficit of 10 overtime hours. (Joint Ex. 1 at 233, 328).

(91)

However, during the week of October 11, 2008, Goulas worked 56 hours and was paid for 68 hours, resulting in a surplus of 12 overtime hours. (Joint Ex. 10 at 229, 327).

(92)

Third, during the week of December 6, 2008, he worked 73 hours and was paid for 68,

---

[1] At this time, Goulas was in the process of repaying salary advances, so he received a paycheck for $692.31, in accordance with that agreement. (Joint Ex. 10 at 327; LaGreca Test.; Goulas Test.).

resulting in a deficit of 5 overtime hours. (Joint Ex. 2 at 71, 245).

(93)

However, during the week preceding December 6, 2008, he worked 15 hours and was paid for 68, resulting in a surplus of 53 hours. (Joint Ex. 1 at 243, 330).

(94)

Thus, Goulas received compensation for all the overtime hours he worked from October 12, 2008 to June 27, 2009.

**2. June 28, 2009 to May 8, 2010**

(95)

From June 28, 2009, to May 8, 2010, there were eight weeks during which Goulas worked more than 68.5 hours. As above, with respect to each of these eight weeks, there was a preceding week during which Goulas worked fewer than 68.5 hours, such that he was eventually compensated for all overtime worked.

(96)

First, during the week of July 18, 2009, he worked 89.25 hours and was paid for 68.5, resulting in a deficit of 20.75 overtime hours. (Joint Ex. 4 at 106, 198).

(97)

Second, during the week of July 25, 2009, he worked 69.75 hours and was paid for 68, resulting a deficit of 1.75 overtime hours. (Joint Ex. 4 at 107. 196).

(98)

However, during the week of July 4, 2009, he worked 35 hours and was paid for 68.5, resulting in a surplus of 33.5 hours. (Joint Ex. 4 at 104, 202).

17

(99)

Third, during the week of August 29, 2009, he worked 69.25 hours and was paid for 68.5, resulting in a deficit of 0.75 overtime hours. (Joint Ex. 4 at 112, 190).

(100)

However, during the week of August 15, 2009, he worked 60.5 hours and was paid for 68.5, resulting in a surplus of 8 overtime hours. (Joint Ex. 4 at 110, 192).

(101)

Fourth, during the week of September 26, 2009, he worked 83 hours and was paid for 68.5, resulting in a deficit of 14.5 overtime hours. (Joint Ex. 4 at 116, 182).

(102)

However, during the week preceding September 26, 2009, he worked 46 hours and was paid for 68, resulting in a surplus of 22 overtime hours. (Joint Ex. 4 at 115, 184).

(103)

Fifth, during the week of October 31, 2009, he worked 73.75 hours and was paid for 68, resulting in a deficit of 5.75 hours. (Joint Ex. 4 at 121, 172).

(104)

However, during the week of October 17, 2009, he worked 60.5 hours and was paid for 68, resulting in a surplus of 7.5 overtime hours. (Joint Ex. 4 at 119, 176).

(105)

Sixth, during the week of November 7, 2009, he worked 72 hours and was paid for 68.5, resulting in a deficit of 3.5 overtime hours. (Joint Ex. 4 at 122, 170).

(106)

However, during the week of October 10, 2009, he worked 61.75 hours and was paid for 68, resulting in a surplus of 5.25 overtime hours. (Joint Ex. 4 at 123, 168).

(107)

Seventh, during the week of March 6, 2010, he worked 71.5 hours and was paid for 68.5, resulting in a deficit of 3.5 overtime hours.  (Joint Ex. 5 at 140, 259).

(108)

However, during the week of February 20, 2010, he worked 44.25 hours and was paid for 68, resulting in a surplus of 23.75 overtime hours.(Joint Ex. 5 at 138, 257).

(109)

Eight, during the week of March 13, 2010, he worked 73.75 hours and was paid for 68.5, resulting in a deficit of 5.25 overtime hours. (Joint Ex. 5 at 141, 260).

(110)

 However, during the week preceding March 6, 2010, he worked 51.5 hours and was paid for 68.5, resulting in a surplus of 17 overtime hours. (Joint Ex. 5 at 139, 258).

(111)

Thus, Goulas received compensation for all the overtime hours he worked from June 29, 2009 to May 8, 2010.

**E.     Goulas' Salary Advances**

(112)

From April 2008 to August 2008, Goulas was on military leave and performed no work for the company. (LaGreca Test.; Goulas Test.).

(113)

During this period, at the request of Goulas' wife, Jennifer Goulas, Services agreed to advance Goulas $3,000 per month—approximately half of his normal salary—in return for his agreement to work at half pay for the same number of weeks upon his return. (LaGreca Test; LaGreca Ex. 1).

(114)

During this period, Goulas received advances for 17 weeks. (Goulas Test.; Joint Ex. 9 at 319-324)

(115)

Goulas agreed to pay back the salary advances when he returned to work for Services. (LaGreca Test.; Goulas Test.).

(116)

After returning to the company, Goulas worked at half pay for 16 weeks, receiving $692.31 (gross) per paycheck. (LaGreca Test.; Goulas Test.; Joint Ex. 1 at 328, 329, 330; Joint Ex. 10 at 325, 326, 327).

(117)

Goulas did not pay back the missing $692.32 payment at any other time. (Goulas Test.).


## CONCLUSIONS OF LAW

### A.     Executive Exemption to FLSA

(1)

On summary judgment and at trial, LaGreca argued that Goulas was exempt from FLSA

due to his employment in an executive capacity. 29 U.S.C. § 213. There are four requirements for the executive exemption to apply. 29 C.F.R. § 541.100. The first requirement is that the employee must be "[c]ompensated on a salary basis at a rate of not less than $455 per week." *Id.* § 541.100(a)(1). The evidence reflects that Goulas received a salary of $65,525 per year, well over $455 per week. An employee receives compensation on a "salary basis" as long as he or she receives "a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed." 29 C.F.R. § 541.602(a). Although Goulas has made some argument that Services impermissibly docked his pay on occasion, or that Services could have reduced his pay if he fell below a certain number of hours, the Court did not hear persuasive evidence supporting either of these claims at trial. Therefore, the Court concludes that Goulas met the first requirement under the executive exemption.

(2)

The second requirement for FLSA's executive exemption is that the employee's "primary duty" must be "management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof." 29 C.F.R. § 541.100(a)(2). Examples of "management" duties include "directing the work of employees; maintaining production or sales records for use in supervision or control; . . . planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; . . . [and] providing for the safety and security of the employees or the property." *Id.* § 541.102. As an exception to this general rule, however, "manual laborers" and "other 'blue

21

collar' workers who perform work involving repetitive operations with their hands, physical

skill, and energy" are not eligible for the executive exemption as a matter of law. 29 C.F.R.

§ 541.3(a). "Such nonexempt 'blue collar' employees gain the skills and knowledge required for

performance of their routine manual and physical work through apprenticeships and on-the-job

training, not through the prolonged course of specialized intellectual instruction required for

exempt learned professional employees such as medical doctors, architects and archeologists."

*Id.* The Court heard conflicting evidence on this requirement at trial. While the Court's Findings

of Fact reflect that Goulas had substantial managerial duties, the trial testimony also indicated

that Goulas spent a significant amount of his time performing "blue collar" work on a day-to-day

basis. Thus, the record is less clear with respect to this requirement than with respect to the other

three.

(3)

In support of their contention that Goulas was an exempt employee, Defendants cite

*Allen v. Coil Tubing Servs., L.L.C.*, 846 F. Supp. 2d 678 (S.D. Tex. 2012), which held that the

supervising member of a drilling crew qualified for the executive exemption under FLSA. *Id.* at

706-710. On the issue of the plaintiff's primary duty in such a position, the court emphasized

that the plaintiff "was the senior CTS employee on all projects to which he was assigned in the

field" and that he "planned, assigned, and managed the work of [other employees] at the project

sites to which he was assigned." *Id.* at 707. The court noted that, even though the plaintiff did

perform manual labor while in the field, and there was conflicting evidence regarding whether he

spent more than half of his time managing other employees, those factors did not necessarily

render him non-exempt. *Id.* at 707 n.56 (citing 29 C.F.R. § 541.700). In *Allen*, the court

22

concluded that the plaintiff qualified for the executive exemption despite his performance of manual labor because "his field oversight duties . . . were crucial to the business of CTS." *Id.* Similarly, in this case, the Court believes that there is sufficient evidence in the record to support a conclusion that Goulas' "primary duty" was managerial, despite the inclusion of manual labor in his regular duties. However, the Court does not need to reach this issue, because as explained below, it concludes that even if Goulas was not exempt, he received adequate compensation for all the overtime hours that he actually worked.

(4)

The third requirement under the executive exemption is that the employee "customarily and regularly directs the work of two or more other employees." 29 C.F.R. § 541.100(a)(3). Goulas did not dispute this point on summary judgment (Rec. Doc. 60 at 12), and the testimony presented at trial also supported a conclusion that Goulas regularly directed the work of at least two other employees.

(5)

The fourth and final requirement for the executive exemption of FLSA is that the employee "has the authority to hire or fire other employees" or alternatively, that the employee's "suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight." 29 C.F.R. § 541.100(a)(4). Defendants do not argue that Goulas had hiring or firing power, but they do argue that LaGreca gave "particular weight" to his opinions. The Court agrees that this requirement is met here. The record reflects that LaGreca gave weight to Goulas' recommendations on various occasions and was in fact grooming Goulas to take over the company one day. While the record is equally clear

23

that LaGreca and Goulas did not always agree on personnel matters—in particular, they appear to have differed with respect to Mr. Lyons, a disagreement that played a major role in Goulas' ultimate termination—complete agreement or acquiescence by LaGreca is not required. All that is required is that LaGreca gave "particular weight" to Goulas' recommendations, and LaGreca has demonstrated that he did so.

(6)

Thus, the Court concludes that Goulas met the first, third, and fourth requirements for the executive exemption to FLSA, and likely also met the second requirement. The Court does not reach the issue of whether Goulas met the second requirement, because it concludes that Goulas has already received compensation for all the overtime hours he worked.

**B.    Compensation Received**

(7)

At trial, Goulas presented the expert testimony of Michael Bergeron, a CPA who calculated the amount of unpaid overtime owed to Goulas. In order to estimate this amount, Mr. Bergeron calculated hourly base and overtime rates from Goulas' salary of \$65,525. He obtained a base hourly rate (\$31.38 per hour) by dividing Goulas' weekly pay by 40—that is, working under the assumption that Goulas's \$65,525 salary was based on a 40-hour work week. However, the Court has found, based on the evidence and testimony presented at trial, that Goulas' salary was based on a 68- or 68.5-hour work week. Additionally, Mr. Bergeron made these calculations under the assumption that Goulas had not already received overtime pay in excess of the total hours he worked. Because the Court finds that both of these assumptions are incorrect, the Court will disregard the testimony and opinions of Mr. Bergeron.

24

(8)

As summarized above, there were 14 weeks between October 12, 2008 and May 8, 2010 during which Goulas worked more than the 68 or 68.5 hours for which he was paid. However, with respect to each of those weeks, there was a preceding week in which Goulas worked fewer than 68 or 68.5 hours.[2] Although an employer should generally pay overtime compensation in the same work period during which an employee performs overtime work, the employer is also allowed to pay overtime compensation in advance. *Singer v. City of Waco, Tex.*, 324 F.3d 813, 824 (5th Cir. 2003). This arrangement is particularly fitting for "cases such as the present one, in which the employees regularly work overtime." *Id.* at 828.[3] The Court concludes that Services does not owe any unpaid overtime to Goulas, because Services pre-paid overtime for all hours

---

[2] The Court credits the timecards, rather than Goulas' testimony, as the best evidence of the hours that Goulas actually worked. The Court discredits Goulas' testimony that he was required to work overnight on occasion, during the weeks for which no timecards are available. Goulas presented no corroborating evidence for this assertion at trial, and Goulas' uncorroborated testimony was not itself sufficiently credible to support such a finding.

Even if the Court chose to credit this testimony, however, it is not clear that Goulas would be entitled to additional compensation. As the timecards reflect, Goulas already received compensation for significantly more hours than he actually worked.

[3] Goulas argues that the Court should not apply *Singer* in light of *Martin v. PepsiAmericas, Inc.*, 628 F.3d 738 (5th Cir. 2010), which limited *Singer* in some respects. However, those limitations are not relevant to this case. *Martin* emphasizes that offsets were appropriate in *Singer* because the employer "had *already* paid the bulk of its overtime obligations," or in other words, that the set-offs "represented overtime obligations already fulfilled." *Id.* at 742 (internal quotation marks omitted).

The Fifth Circuit distinguished the facts of *Martin*, in which the employer had provided the employee with a severance package and sought to offset its FLSA damages by that amount. *Id.* at 740. In other words, the mere fact that "the employer paid some extra money or benefits to the employee to which the employee was not otherwise entitled" did not automatically entitle the employer to offset its damages.

In the instant case, Services seeks to offset the overtime wages it owes to Goulas with other wages it actually paid to Goulas. This is clearly permissible under *Singer* and is not foreclosed by *Martin*.

25

that Goulas worked in excess of the hours for which he was paid. Essentially, the Court chooses to "offset[] the overpayments paid to [Goulas] in some work periods against the shortfall in other periods." *Id.* After offsetting Goulas' payments in this way, the Court concludes that Goulas received the statutorily required overtime compensation for all the overtime hours he actually worked.[4]

(9)

In post-trial briefing, Goulas argues that his compensation was an impermissible "blended" pay scheme failing to account for the actual number of regular and overtime hours he worked. The Court does not agree, as Goulas has not shown that his compensation scheme was "an attempt to pay a pro-rata share of the weekly wage for an hour's labor regardless of the number of hours worked" up to a number greater than 40. *149 Madison Ave. Corp. v. Asselta*, 331 U.S. 199, 206 (1947). Goulas' compensation reflects an hourly rate for hours up to 40 and a triple-time hourly rate for hours above 40, and the Court sees no reason to doubt the honesty of that scheme.

(10)

The Court also does not find convincing Goulas' suggestion that his compensation was based on an artificially low "regular" rate, as he "would never have agreed to work for a mere $10.00 an hour as his only compensation."  (Rec. Doc. 67 at 5). Goulas had limited education and experience during his employment with Services, and he has not demonstrated that pay of $10 per hour was artificially low for an entry-level employee such as himself. In fact, Goulas

---

[4] In fact, as Defendants have pointed out in their briefs and at trial, Goulas ultimately received compensation for significantly *more* hours than he actually worked.

seems to have actually agreed to work for a similar wage just one year before, when he began working for Services for pay of approximately $30,000 per year. This case is significantly distinguishable from *Gagnon v. United Technisource, Inc.*, 607 F.3d 1036 (5th Cir. 2010), in which the plaintiff, "a skilled craftsman with many years experience," was receiving only $5.50 per hour "straight time" and $20.00 per hour for overtime, as well as a $12.50 per hour "per diem" that was excluded from the normal wage calculations. *Id.* at 1039.

**C.     Salary Advances**

(11)

The evidence and testimony reflect that Goulas received 17 weeks of salary advance payments from LaGreca while on military leave, but only repaid 16 of those payments after returning to the company. Therefore, the Court concludes that Goulas owes $692.31 to Services.

(12)

The parties dispute whether the Court has remanded Defendants' claim for airfare, which Defendants allege that Goulas failed to repay. On April 1, 2013, the Court severed and remanded all of Defendants' previously pled counterclaims "with the exception of the claim for failure to repay salary advances." (Rec. Doc. 46 at 2). Because Defendants' claim for airfare was listed separately from the claim for salary advances (or "other advances") in both the original (Rec. Doc. 1-1 at 16) and amended (Rec. Doc. 19 at ¶ 19) counterclaims, the Court concludes that it remanded this claim to state court on April 1, 2013 and no longer has jurisdiction as a result.

**D.     Conclusion**

In summary, the Court rules in Defendants' favor on Plaintiff's claim for unpaid overtime under FLSA and Defendants' counterclaim for an unpaid salary advance of $692.31.

With respect to Defendants' counterclaim for airfare, the Court holds that it severed and remanded this claim to state court, and therefore lacks jurisdiction.

New Orleans, Louisiana this 6th day of June, 2013.

UNITED STATES DISTRICT JUDGE